Case 2:18-mj-03261-DUTY  Document 3  Filed 12/21/18  Page 1 of 34  Page ID #:133
Case 2:18-mj-03261-DUTY *SEALED*  Document 1-1 *SEALED*  Filed 12/12/18  Page 1 of 33
Page ID #:33

AO 93 (Rev. 12/09) Search and Seizure Warrant  (USAO CDCA Rev. 01/2013)

ORIGINAL

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No.  2:18-MJ-3261
4722 Blackthorne Avenue )
Long Beach, California 90808 )
)

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Central_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:
   See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
   See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.  Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before     14 days from the date of its issuance
                                                                *(not to exceed 14 days)*
☐ in the daytime  6:00 a.m. to 10 p.m.     ☑ at any time in the day or night as I find reasonable cause has been
                                               established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
                                               *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30)*.
                                ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  2:49 p.m.  December 12, 2018                     _____
                                                                          *Judge's signature*

City and state:   Los Angeles, California                   Hon. Karen Stevenson, U.S. Magistrate Judge
                                                                     *Printed name and title*

AUSA: JM:nl

Case 2:18-mj-03261-DUTY-ED Document 3 Filed 12/21/18 Page 2 of 34 Page ID #:134
Case 2:18-mj-03261-DUTY-ED *SEALED* Document 1 *SEALED* Filed 12/12/18 Page 2 of 33
Page ID #:34

*AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| **Return** | | |
|---|---|---|
| Case No.:<br>2:18-MJ-3261 | Date and time warrant executed:<br>13 DEC 18   0500 | Copy of warrant and inventory left with:<br>GUILLERMO LOPEZ |
| Inventory made in the presence of :<br>GUILLERMO LOPEZ | | |

Inventory of the property taken and name of any person(s) seized:

[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes). If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

1) ONE WHITE IPHONE; IMEI 35204507 9323522
2) ONE GOLD SAMSUNG
3) ONE BLACK + SILVER SEAGATE HARD DRIVE S/N NA7LMH4
4) ONE SILVER 16GB IPAD SERIAL F54KD937DFHW
5) ONE SILVER DIREKT-TEK LAPTOP S/N DTLAPY133.1.SL17J119
6) ONE HP BLACK LAPTOP CHROME BOOK W/CORD
7) ONE BLACK HP LAPTOP W/CORD
8) 11 VARIOUS FLASH DRIVES + 2 SD CARDS
9) ONE DELL LAPTOP BLACK
10) ONE BLACK IPAD
11) ONE FC USB DRIVE
12) ONE SEAGATE EXTERNAL HARD DRIVE
13) ONE WDMY PASSPORT SLIM HARD DRIVE
14) ONE WD HARD DRIVE EXTERNAL
15) ONE CAVALRY EXTERNAL HARD DRIVE
16) DELL TOWER S/N C4RC2VI
17) ONE SILVER IMAC

| **Certification** (by officer present during the execution of the warrant) |
|---|

I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.

Date:   21 DEC 18

_____
*Executing officer's signature*

BRANDON BUFORD; SPECIAL AGENT
*Printed name and title*

## ATTACHMENT A

PREMISES TO BE SEARCHED

     The premises to be searched is the property located at 4722 Blackthorne Avenue, Long Beach, California 90808 (the "SUBJECT PREMISES"), which is located on a single lot. The SUBJECT PREMISES is the building located adjacent to Blackthorne Avenue and has the numbers "4722" at the front of the residence to the right of the front door. The SUBJECT PREMISES is on the east side of Blackthorne Avenue located between Del Amo Boulevard to the north and East Arbor Road to the south. The SUBJECT PREMISES's exterior walls are beige in color. Large windows with white window frames are located on both sides of the front door. A white metal security door is adjacent to the front door, which faces west toward the street. The roof appears to be composed of brown colored shingles. There is a tree in the center of the front yard and a palm tree to the left of the front door, close to the house. A driveway is on the south side of the property. The driveway leads to a wooden gate. The driveway leads past the wooden gate that appears to be a garage. The garage has the same color pattern and roof material as the main house. The garage door is white. The SUBJECT PREMISES includes any garages, sheds, outbuildings, storage areas, or other areas assigned to 4722 Blackthorne Avenue, Long Beach, California 90808, including those that may be located in the backyard.

Case 2:18-mj-03261-DUTY Document 3 Filed 12/21/18 Page 4 of 34 Page ID #:136
Case 2:18-mj-03261-DUTY *SEALED* Document 1-1 *SEALED* Filed 12/12/18 Page 4 of 33
Page ID #:36





ii

Case 2:18-mj-03261-DUTY Document 3 Filed 12/21/18 Page 5 of 34 Page ID #:137
Case 2:18-mj-03261-DUTY *SEALED* Document 1-1 *SEALED* Filed 12/12/18 Page 5 of 33
Page ID #:37

## ATTACHMENT B

I.      **ITEMS TO BE SEIZED**

1.      The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography) (the "Subject Offenses"), namely:

     a.      Child pornography, as defined in 18 U.S.C. § 2256(8).

     b.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

     c.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

     d.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer or relate to any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

     e.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, identifying persons transmitting in interstate commerce,

Case 2:18-mj-03261-DUTY  Document 3  Filed 12/21/18  Page 6 of 34  Page ID #:138
Case 2:18-mj-03261-DUTY *SEALED*  Document 1-1 *SEALED*  Filed 12/12/18  Page 6 of 33
Page ID #:38

including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

        f.     Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

        g.     Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

        h.     Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

        i.     Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to peer-to-peer file sharing software.

        j.     Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

        k.     Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of 4722 Blackthorne Avenue, Long Beach, California 90808 (the "SUBJECT PREMISES").

Case 2:18-mj-03261-DUTY  Document 3  Filed 12/21/18  Page 7 of 34  Page ID #:139
Case 2:16-mj-03261-DUTY *SEALED*  Document 1-1 *SEALED*  Filed 12/12/18  Page 7 of 33
Page ID #:39

l.　　Any records, documents, and material relating to IP address 47.156.93.64 (the "SUSPECT IP ADDRESS").

m.　　Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of files related to minor children, to include photographs, videos, e-mails, chat logs, or other files.

n.　　Records, documents, programs, applications, materials, and files relating to the online social media accounts of any minor children.

o.　　Any digital device used to facilitate the above-listed violations and forensic copies thereof.

p.　　Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

q.　　With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.　　evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.　　evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.　　evidence of the attachment of other devices;

Case 2:18-mj-03261-DUTY Document 3 Filed 12/21/18 Page 8 of 34 Page ID #:140
Case 2:18-mj-03261-DUTY-SEALED Document 1-1 SEALED Filed 12/12/18 Page 8 of 33
Page ID #:40

     iv.  evidence of counter-forensic programs (and associated data) that

are designed to eliminate data from the device;

     v.  evidence of the times the device was used;

     vi.  passwords, encryption keys, biometric keys, and other access

devices that may be necessary to access the device;

     vii.  applications, utility programs, compilers, interpreters, or other

software, as well as documentation and manuals, that may be necessary to access the device or to

conduct a forensic examination of it;

     viii.  records of or information about Internet Protocol addresses used by

the device;

     ix.  records of or information about the device's Internet activity,

including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web

pages, search terms that the user entered into any Internet search engine, and records of user-

typed web addresses.

  2.  As used herein, the terms "records," "documents," "programs," "applications,"

and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic

copies thereof.

  3.  As used herein, the term "digital device" includes any electronic system or device

capable of storing or processing data in digital form, including central processing units; desktop,

laptop, notebook, and tablet computers; personal digital assistants; wireless communication

devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital

cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral

input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES

4.      In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.      Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

b.      The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

vii

        ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii.     The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

        c.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

        d.     If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.     If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        f.     If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

   g. Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

   6. During the execution of this search warrant, law enforcement is permitted to: (1) depress Guillermo Lopez's thumb- and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the Guillermo Lopez's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

   7. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

## AFFIDAVIT

I, Brandon Buford, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2018.  My responsibilities with the FBI include investigations into the sexual exploitation of children and child pornography in the Central District of California. The FBI is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under 18 U.S.C. § 2251, et seq.

2.      Through my training and experience, I have become familiar with the methods of operation used by people who are involved with offenses involving the sexual exploitation of children.  During new agent training, I learned investigative techniques that included computer based forensic examination as well as legal training in federal criminal law. This training has given me an understanding of how people involved with offenses relating to the sexual exploitation of children use the Internet to further those offenses.  My experience in investigations in this regard has supplemented my understanding of how people involved in offenses relating to the sexual exploitation of children use the Internet to further those offenses.

## II.  PURPOSE OF AFFIDAVIT

3.      This affidavit is made in support of an application for a warrant to search the premises located at 4722 Blackthorne Ave, Long Beach, California 90808 (the "SUBJECT PREMISES"), more fully described below and in Attachment A, which is attached hereto and incorporated herein by reference, and to seize evidence, fruits, and instrumentalities, as specified in Attachment B, which is also attached hereto and incorporated by reference, of violations of 18

U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography) (the "Subject Offenses").

4.     The statements in this affidavit are based upon my personal observations, my training and experience, my investigation of this case, and, where noted, information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. PREMISES TO BE SEARCHED

5.     The premises to be searched is the property located at 4722 Blackthorne Avenue, Long Beach, California 90808 (the "SUBJECT PREMISES"), which is located on a single lot. The SUBJECT PREMISES is the building located adjacent to Blackthorne Avenue and has the numbers "4722" at the front of the residence to the right of the front door. The SUBJECT PREMISES is on the east side of Blackthorne Avenue located between Del Amo Boulevard to the north and East Arbor Road to the south. The SUBJECT PREMISES's exterior walls are beige in color. Large windows with white window frames are located on both sides of the front door. A white metal security door is adjacent to the front door, which faces west toward the street. The roof appears to be composed of brown colored shingles. There is a tree in the center of the front yard and a palm tree to the left of the front door, close to the house. A driveway is on the south side of the property. The driveway leads to a wooden gate. The driveway leads past the wooden gate that appears to be a garage. The garage has the same color pattern and roof material as the main house. The garage door is white. The SUBJECT PREMISES includes any

garages, sheds, outbuildings, storage areas, or other areas assigned to 4722 Blackthorne Avenue, Long Beach, California 90808, including those that may be located in the backyard.

## IV. SUMMARY OF INVESTIGATION

6.      In September and October 2018, FBI SA Timothy Alon, in an undercover capacity, used a peer-to-peer program to download child pornography from another peer-to-peer user. This child pornography was publicly available for download to any Internet user with compatible peer-to-peer file-sharing software, which is available for free over the Internet. The IP address of the computer offering the child pornography was assigned to the SUBJECT PREMISES. Thus, there is probable cause to believe that the SUBJECT PREMISES contains evidence of criminal activity in violation of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography).

## V. BACKGROUND REGARDING CHILD EXPLOITATION OFFENSES, COMPUTERS, AND THE WORLDWIDE INTERNET COMPUTER COMMUNICATION NETWORK

7.      In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256. The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

8.      Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

        a.      Computers and Child Pornography. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats. The use of digital

3

technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

    b. <u>Storage</u>. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store hundreds of thousands of images at very high resolution. Images can also be stored on portable thumb drives and removable, external hard drives.

    c. <u>Internet</u>. The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide. The Internet is not an online service and has no real central hub. It is a collection of tens of thousands of computer networks, online services, and single user components. In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

    d. <u>Internet Service Providers</u>. Individuals and businesses obtain access to the Internet through ISPs. ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them. Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction

Case 2:18-mj-03261-DUTY SEALED Document 1-1 SEALED Page Filed 12/12/18 Page 17 of 33 Page ID #:49

information, posting information, account application information, and other information both in computer data and written record format.

      e.    IP Addresses. An Internet Protocol address ("IP address") is a unique numeric address used to connect to the Internet. An IPv4 IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP. What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example. Because the home subscriber typically only has one Internet connection and is only assigned one IP address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub. Internet activity from every device attached to the router or hub is utilizing the same external IP address assigned by the ISP. The router or hub "routes" Internet traffic so that it reaches the proper device. Most ISPs control a range of IP addresses. The IP address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP address is only assigned for the duration of that online session. Most ISPs maintain records of which subscriber was assigned which IP address during an online session.

      f.    IP Address – IPv6. Due to the limited number of available IPv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP addresses. An IPv6 consists of eight sets of combination of four numbers 0-9 and/or letters A through F. An example of an IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

g.    Peer-to-Peer.  The term "peer-to-peer" ("P2P") has come to describe applications or programs that allow users to exchange files with each other directly or through a mediating server, via the Internet.[1]  A decentralized peer-to-peer file transfer network does not follow a model using different clients or servers; but, rather, it is a network of equal peer computers that simultaneously function as both "clients" and "servers" to the other users on the same network.

h.    Open Source.  The term "open source" is defined as software that includes a free license; in other words, it is freely available to everyone using the Internet.

i.    Share Folder.  The term "share folder," in the context of P2P software, is a folder or directory on a computer's hard drive, which a P2P user can set up to share his/her contents with other computers on a peer-to-peer network.  Most P2P software defaults to allow other users with compatible software on the same peer-to-peer network to browse this share folder, and download files.  The term "browsing," as used in reference to peer-to-peer networks, refers to the ability of a P2P user to look at or browse the shared files of another P2P user.

j.    The terms "jpeg," "jpg," "gif," "bmp," and "art" are defined as graphic image files, namely, pictures.

k.    The terms "mpeg," "mpg," "mov," "avi," "rm," and "wmv" are defined as video or movie files.  To use these video files, one needs a personal computer or other digital devices with sufficient processor speed, internal memory, and hard disk space to handle and play typically large video files.  One also needs a video file viewer or client software that plays video

---

[1]  A computer that is performing tasks for other computers that are connected to it is often called a "server."  A "client" computer is one that is connected to a server and is making requests of the server.

6

files. One can download shareware or commercial video players from numerous sites on the Internet.

l. A growing phenomenon on the Internet is P2P file sharing. P2P file sharing is a method of communication available to Internet users through the use of special software. Computers linked together through the Internet using this software form a network that allows for the sharing of digital files between users on the network. A user first obtains the P2P software, which can be downloaded from the Internet. In general, P2P software allows the user to set up file(s) on a computer to be shared with others running compatible P2P software. A user obtains files by opening the P2P software on the user's computer, and conducting a search for files currently being shared on the network. BitTorrent, one type of P2P software, sets up its searches by keywords typically on websites, known as Torrent websites, which are dedicated to servicing the BitTorrent software. Users enter keyword searches into the Torrent website to identify and locate files of interest. Torrent websites do not contain the actual files of interest. Rather, the Torrent websites provide a file known as a "torrent."

m. A torrent file is a computer file that contains metadata about files and folders to be distributed, and usually also a list of the network locations of trackers, which are computers that help participants in the system find each other and form efficient distribution groups called "swarms." A torrent file does not contain the content to be distributed; it only contains information about those files, such as their names, sizes, folder structure, and cryptographic hash values (known as "info hashes") for verifying file integrity. Torrent files are normally named with the extension ".torrent," as in "MyFile.torrent."

n. After a Torrent website is queried, the website will provide the user with a list of ".torrent" file(s) that relate to the user's search.

        o.     After the user selects and downloads a ".torrent" file that matches his/her search query, the user can download the actual files of interest only through a direct connection to the computer(s) sharing the actual file. This direct connection is accomplished through a P2P BitTorrent software program.

        p.     For example, a person interested in obtaining child pornographic images would access a Torrent website on his/her Internet browser and conduct a keyword search for files using terms such as "preteen sex." The Torrent website sends out the search query over the network of computers using compatible P2P software. The results of the search are returned to the user's computer and displayed on the Torrent website. The user selects the file(s) he/she wants to download from the results displayed on the Torrent website. Once the ".torrent" file is downloaded, it is used by a BitTorrent P2P software program, which the user must have previously installed, to download the child pornography files directly from the computer sharing the files. The downloaded files are stored in an area on the user's computer that was previously designated by the user and/or the software. The downloaded file will remain on the user's computer until moved or deleted by the user.

        q.     One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel. This means that the user can download more than one file at a time. In addition, a user may download parts of one file from more than one source computer at a time. For example, a BitTorrent user downloading an image file may actually receive parts of the image from multiple computers. The advantage to this is that it speeds up the time it takes to download the file. Often, however, a user downloading a file receives the entire file from one computer.

r.      A P2P file transfer is assisted by reference to an IP address.  This address, expressed as four numbers separated by decimal points, is unique to a particular computer during an online session.  The IP address provides a unique location, making it possible for data to be transferred between computers.

s.      The computer running the file-sharing application, in this case BitTorrent, has an IP address assigned to it while it is on the Internet.  Investigators are able to see the IP address of any computer system sharing files.  Investigators can then search public records (e.g., the American Registry of Internet Numbers at www.arin.net) that are available on the Internet to determine the ISP who has assigned that IP address.  Based upon the IP address assigned to the computer sharing files, subscriber information can be obtained from the Internet service provider.

## VI. STATEMENT OF PROBABLE CAUSE

### A.      Child Pornography Downloads from the SUSPECT IP ADDRESS

9.      On or about November 20, 2018, I received information from SA Timothy Alon, an FBI agent assigned to the FBI office located in Long Beach, California, regarding a BitTorrent file-sharing investigation he conducted in September and October 2018.  I learned the following from reading SA Alon's reports:

a.      Between on or about September 25, 2018, and on or about October 25, 2018, SA Alon used a BitTorrent application to conduct an undercover investigation into the Internet sharing of child pornography.  During this investigation, a computer sharing suspected child pornography was located on the BitTorrent file-sharing network.  SA Alon downloaded over 5,700 images and videos of suspected child pornography, including child erotica and child pornography, from a computer using an IP address of 47.156.93.64 (the "SUSPECT IP

9

ADDRESS"). BitTorrent identifies a collection of shared files though a unique value, referred to as an info hash. Nine separate info hashes were associated with the SUSPECT IP ADDRESS with a collection of over 6,000 files, from which SA Alon downloaded over 5,700 files. Many of the downloaded files depict the sexual exploitation of children that appear to be under thirteen years old. The following are three examples of files downloaded from info hash sets:

        i.     The torrent info hash

"04c36c3c08a2fe2be062850ec6dfcbe8460509b5" was investigated on or about September 29, 2018. This unique info hash identified a BitTorrent collection of over 5,600 files. On or about September 29, 2018, SA Alon downloaded over 5,500 files of suspected child pornography in this collection from a computer that was using the SUSPECT IP ADDRESS. As discussed below, in my subsequent review of the downloaded content, I observed what appeared to be files containing child pornography.

        ii.     The torrent info hash

"c8b708e65cbeba3ee7276d0a259e857abdc885fc" was investigated on or about September 30, 2018. This unique info hash identified a BitTorrent collection of over 35 files. On or about September 30, 2018, SA Alon downloaded approximately 20 files of suspected child pornography in this collection from a computer that was using the SUSPECT IP ADDRESS. As discussed below, in my subsequent review of the downloaded content, I observed what appeared to be files containing child pornography.

        iii.     The torrent info hash

"1ce740308cda9e0ca0d35920aed97d8dde196c66" was investigated on or about September 30, 2018. This unique info hash identified a BitTorrent collection of approximately 30 files. On or about September 30, 2018, SA Alon downloaded approximately 23 files of suspected child

10

pornography in this collection from a computer that was using the SUSPECT IP ADDRESS. As discussed below, in my subsequent review of the downloaded content, I observed what appeared to be files containing child pornography.

        b.    SA Alon used the American Registry for Internet Numbers ("ARIN") and confirmed that the SUSPECT IP ADDRESS was registered to the Frontier Communications Corporation.

    10.    On or about November 20, 2018, I reviewed the files that SA Alon downloaded from the SUSPECT IP ADDRESS, as discussed above. During my review, I observed videos and images depicting what appeared to be child pornography. The following are examples of the suspected child pornography I observed that were previously downloaded by SA Alon from the SUSPECT IP ADDRESS:

        a.    BabyJ-001.avi – This video depicts what appears to be a minor female under five years of age being penetrated by an adult male's penis through her genitals.

        b.    4babylvr2.jpg – This video depicts what appears to be a female baby with her legs spread. Touching her genitals is a translucent object resembling an erect penis.

        c.    (Hussyfan) (pthc) (r@ygold) (babyshivid)-K- K !!!NEW - WetB4ass (marissa).avi – This video depicts what appear to be two minor females, both under thirteen years old, engaging in sexual acts. The sexual acts include digital penetration, oral sex, and masturbation.

        d.    (Pthc) Father Seduces 7Yo Daughter.mpg – This video depicts what appears to be a minor female under ten years old engaging in sexual acts with an adult male. The sexual acts include rubbing an erect penis on the minor female's genitals, fondling, stroking of an erect penis, and intercourse.

11

e.    !!! NEW Pthc - 0607!!! kelly - 7yo backyard fuck & pedo kittycum.mpg - This video depicts what appears to be a minor female, under ten years old, engaging in sexual acts with an adult male.  The sexual acts include spreading of the minor female's genitals, masturbating, and ejaculating on the minor female's genitals.

f.    (Pthc) !!! New 0604 !!! Luvnlilly 3Yo(1).avi – This video depicts what appears to be a minor female under ten years old engaging in sexual acts with an adult male.  The sexual acts include placing an erect penis by the minor female's genitals, stroking of an erect penis by the minor female, fellatio, and ejaculating on her body.

**B.    Identification of the SUSPECT IP ADDRESS and SUBJECT PREMISES**

11.    On or about October 15, 2018, I reviewed a Frontier Communications report, including subscriber information for the SUSPECT IP ADDRESS.  According to the report dated on or about October 10, 2018, the subscriber for the SUSPECT IP ADDRESS from on or about September 30, 2018, to the date of the report, was Guillermo Lopez ("LOPEZ") at the SUBJECT PREMISES.  LOPEZ's service started on or about September 19, 2018.

12.    On or about October 15, 2018, I reviewed LOPEZ's California Department of Motor Vehicle ("DMV") records dated on or about October 10, 2018.  According to DMV records, LOPEZ's current address of record is the SUBJECT PREMISES as of March 5, 2015, which includes the dates in September and October 2018 that SA Alon downloaded suspected child pornography from the SUSPECT IP ADDRESS assigned to the SUBJECT PREMISES.

13.    On or about November 4, 2018, I observed an adult male who appeared to be the same individual depicted in a DMV photo of LOPEZ arrive at the SUBJECT PREMISES in an orange 2003 GMC Sierra, license number 1132832.  The logo on the side of the truck read "Recreation and Parks."  The individual, who I believe to have been LOPEZ, parked the GMC

12

Sierra on the street in front of the SUBJECT PREMISES, unlocked the front door of the

SUBJECT PREMISES with a key, and entered the SUBJECT PREMISES.

14.     On or about November 6, 2018, I received a report from a confidential law

enforcement database stating that LOPEZ, born 1960, worked for the City of Los Angeles.

15.     On or about November 9, 2018, I again conducted surveillance at the SUBJECT

PREMISES.  At approximately 5:29 a.m.,[2] I again observed the individual I believed to be

LOPEZ exit the front door of the SUBJECT PREMISES and enter a 2009 Mini Cooper, license

number 7ZIB395, which was parked on the street in front of the SUBJECT PREMISES.  This

vehicle is registered to Monica Lopez, who according to a confidential law enforcement

database, also resides at the SUBJECT PREMISES.  LOPEZ departed the residence in the 2009

Mini Cooper, drove to the Los Angeles Department of Recreation & Parks at 1670 Palos Verde

Drive North, Harbor City, California 90710, and parked the vehicle in the parking lot of this

location.

16.     On or about November 11, 2018, I again conducted surveillance at the SUBJECT

PREMISES.  I identified another vehicle, a 2003 Dodge pickup truck with California license

plate 7C93944, parked in the driveway on the SUBJECT PREMISES.  On or about November

---

[2] Based on surveillance I have conducted at the SUBJECT PREMISES, it appears that
LOPEZ leaves the SUBJECT PREMISES for work at an early hour, often around 5:30 a.m.  Due
to this early work scheduled by a subject of this investigation, I am requesting night service to
allow execution of the requested warrant prior to when LOPEZ leaves the SUBJECT
PREMISES for work.  Based on my training and experience, individuals often keep digital
devices on their persons.  Night service will allow execution of the warrant while LOPEZ is
inside the SUBJECT PREMISES, and will help facilitate seizure and search of LOPEZ's digital
devices for evidence as described in Attachment B.  Presence of LOPEZ, the current subject of
the investigation, inside the SUBJECT PREMISES will further allow executing agents to
identify which digital devices found inside the SUBJECT PREMISES belong to LOPEZ and also
further allow for biometric unlock of the devices as described below and in Attachment B.
Accordingly, I respectfully request authorization for night service of the requested warrant.

11, 2018, I learned from reading DMV information that this vehicle was registered to LOPEZ at the SUBJECT PREMISES.

17.    On or about November 30, 2018, I reviewed another Frontier Communications report for the subscriber for the SUSPECT IP ADDRESS, and spoke with a Frontier Security Operations Legal Compliance agent.  This Frontier Communications report and my conversations with the Operations Legal Compliance agent confirmed that the subscriber for the SUSPECT IP ADDRESS from on or about September 19, 2018 to on or about October 26, 2018, was LOPEZ at the SUBJECT PREMISES.

18.    Accordingly, there is probable cause to believe that someone at the SUBJECT PREMISES possessed, made available for distribution, and distributed multiple files containing child pornography on or about between September 25, 2018 and October 25, 2018, and, as discussed in greater detail below, that evidence of such is likely to be found at the SUBJECT PREMISES.

## VII.    TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

19.    As set forth above, someone using the SUSPECT IP ADDRESS at the SUBJECT PREMISES appears to possess hundreds of child pornography files, and is making these files available for distribution to others.  Based on the facts set forth above, it is my opinion that there is probable cause to believe that someone at the SUBJECT PREMISES is sexually interested in children and collecting images of the sexual exploitation of children.  Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

14

Case 2:18-mj-03261-DUTY-SEALED Document 3 Filed 12/21/18 Page 27 of 34 Page ID #:159
Case 2:18-mj-03261-DUTY-SEALED Document 11 SEALED 99 Filed 12/12/18 Page 27 of
33 Page ID #:59

a.      Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.

b.      Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Individuals who have a sexual interest in children or images of children sometimes possess hard copies of child pornography, such as pictures, films, video tapes, magazines, negatives, photographs, etc. More recently, individuals who have a sexual interest in children or images of children almost always maintain child pornography in digital or electronic format, stored either on digital devices or in remote storage locations on the Internet. Regardless of whether these individuals collect their child pornography in hard copy or digital format, they often maintain their child pornography for long periods of time, even years. Such individuals almost always maintain their collections in a safe, secure, and private environment, such as their homes. These collections are kept close by, usually at the individual's residence, to enable the individual to view the child pornography, which is valued highly.

       d.      Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. Additionally, individuals who receive or share child pornography with other online users often keep backups and copies of those materials on other digital or storage devices in their homes, cars, or other nearby locations.

       e.      Individuals who have a sexual interest in children or images of children prefer not to be without child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

       f.      The child pornography distributed from the SUBJECT PREMISES was in digital format and stored on a digital device. Digital child pornography on a digital device is easy to maintain for long periods of time. Modern digital devices often have extremely large storage capacities. Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact disks make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

       g.      Furthermore, even if the individual at the SUBJECT PREMISES deleted child pornography files that he/she may have possessed, received, or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and distribution of child pornography – at the SUBJECT PREMISES. Based on my training and experience, as well as my conversations with digital forensics agents, I know

16

that computer files or remnants of such files can be recovered months or even years after they

have been downloaded onto a hard drive, deleted, or viewed via computer. Electronic files

downloaded to a hard drive can be stored for years at little to no cost. Even when such files have

been deleted, they may be recoverable months or years later using readily available forensic

tools. When a person "deletes" a file on a home computer, the data contained in the file does not

actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.

Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space --

that is, in space on the hard drive that is not allocated to an active file or that is unused after a file

has been allocated to a set block of storage space for long periods of time before they are

overwritten. In addition, a computer's operating system may also keep a record of deleted data

in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are

automatically downloaded into a temporary Internet directory or cache. The browser typically

maintains a fixed amount of hard drive space devoted to these files, and the files are only

overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to

retrieve residue of an electronic file from a hard drive depends less on when the file was

downloaded or viewed than on a particular user's operating system, storage capacity, and

computer habits. Because computer evidence is recoverable after long periods of time, and

because there is probable cause to believe that someone at the SUBJECT PREMISES was once

in possession of child pornography and likely obtained it from some as yet unidentified source,

there is probable cause to believe that evidence of activity related to the distribution, receipt, and

possession and distribution of child pornography will be found at the SUBJECT PREMISES..

17

## VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

20.     Based on my training, experience, and information from those involved in the

forensic examination of digital devices, I know that the following electronic evidence, inter alia,

is often retrievable from digital devices:

a.      Forensic methods may uncover electronic files or remnants of such files

months or even years after the files have been downloaded, deleted, or viewed via the Internet.

Normally, when a person deletes a file on a computer, the data contained in the file does not

disappear; rather, the data remain on the hard drive until overwritten by new data, which may

only occur after a long period of time.  Similarly, files viewed on the Internet are often

automatically downloaded into a temporary directory or cache that are only overwritten as they

are replaced with more recently downloaded or viewed content and may also be recoverable

months or years later.

b.      Digital devices often contain electronic evidence related to a crime, the

device's user, or the existence of evidence in other locations, such as, how the device has been

used, what it has been used for, who has used it, and who has been responsible for creating or

maintaining records, documents, programs, applications, and materials on the device.  That

evidence is often stored in logs and other artifacts that are not kept in places where the user

stores files, and in places where the user may be unaware of them.  For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online

nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

---

[3] As used herein, the term "digital device" includes any electronic system or device
capable of storing or processing data in digital form, including central processing units; desktop,
laptop, notebook, and tablet computers; personal digital assistants; wireless communication
devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming
consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and
drives; related communications devices, such as modems, routers, cables, and connections;
storage media; and security devices.

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   21.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b.  Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

Case 2:18-mj-03261-DUTY SEALED Document 1-1 SEALED Filed 12/12/18 Page 32 of 33 Page ID #:64

22.     The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.      Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.      In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.      Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LOPEZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of LOPEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

23.     Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

20

## IX. CONCLUSION

20.     For the reasons described above, there is probable cause to believe that evidence,

fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of

child pornography), and 2252A(a)(5)(B) (possession of child pornography), as described in

Attachment B, will be found in a search of the SUBJECT PREMISES, as described in

Attachment A.


Brandon Buford, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
This 12 day of December, 2018.

HONORABLE  KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE

21

# Magistrate Case Initiating Documents

2:18-mj-03261 USA v. Search Warrant

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered by Mausner, Joshua on 12/12/2018 at 12:28 PM PST and filed on 12/12/2018

| | |
|---|---|
| **Case Name:** | USA v. Search Warrant |
| **Case Number:** | 2:18-mj-03261 |
| **Filer:** | USA |

**Document Number:** 1

**Docket Text:**
**APPLICATION FOR A SEARCH AND SEIZURE WARRANT filed by Plaintiff USA. (Not for Public View pursuant to the E-Government Act of 2002) (Attachments: # (1) Proposed Warrant) (Attorney Joshua Omrani Mausner added to party USA(pty:pla)) (Mausner, Joshua)**

**2:18-mj-03261-1 Notice has been electronically mailed to:**

**2:18-mj-03261-1 Notice has been delivered by First Class U. S. Mail or by other means <u>BY THE FILER</u> to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\Users\nluqueno\Desktop\4722 Blackthorne Ave Application for Warrant.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=12/12/2018] [FileNumber=26763900-0] [5ea6714978461cbe4b35e99228cf890a78377bb21c365ae847e62a0318e1c4a2eb f047d1620e2e57d326773d775d7509bd801702e4ed1de1a378c5a3cc8a9ae9]]
**Document description:**Proposed Warrant
**Original filename:**C:\Users\nluqueno\Desktop\4722 Blackthorne Ave Warrant.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=12/12/2018] [FileNumber=26763900-1] [11b3890cc9d46f5ea831d3cd09f40901939911dfe08de9a1216083d32fbc0048cc 6e9e1b02b0a1fa75bb348e3d9a0ebd931b0783da0470f82628eea3aee79c09]]